REYNA, Circuit Judge,
dissenting.
The majority concludes that a “Taxes” clause in several contracts for high-octane aviation gas (“avgas”) should be broadly interpreted to require the United States to indemnify the Oil Companies for a CERCLA judgment covering restoration efforts of the McColl acid waste site more than fifty years after the completion of the contracts. I do not interpret the “Taxes” clause as a general indemnification clause that captures production-related costs. For this and the other reasons set forth below, I respectfully dissent.
I.
This appeal arises following the Oil Companies’ failure to recover the McColl site clean-up costs through the CERCLA litigation that took place in California. The CERCLA regime allows a party that is financially responsible for the clean-up costs of environmental contamination to seek contribution from other responsible parties. 42 U.S.C. § 9613(f)(1). District courts thus have broad discretion to resolve contribution claims “using such equitable factors as [they] determine[ ] are appropriate.” Id.; see also Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir.2000) (noting that CERCLA “gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors”). After failing to achieve a satisfactory outcome under CERCLA’s equitable considerations, the Oil Companies now seek recovery through a different avenue — a breach of contract action. In doing so, they breach the four corners of their avgas contracts by asking this court to interpret the “Taxes” clause as a catch *1304 all indemnification provision. Such an interpretation, in my view, has no basis in the plain language of the clause or the overall scope of the contract. I would therefore affirm the decision of the Court of Federal Claims and hold that the “Taxes” clause was intended by the parties to be nothing more than a price-adjustment mechanism covering additional or unanticipated tax-related burdens assessed by reason of avgas production.[1]
“Contract interpretation is a question of law, which [the court] review[s] without deference.” 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed.Cir.2009); TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1336 (Fed.Cir.2006). “In the ease of contracts, the avowed purpose and primary function of the court is the ascertainment of the intention of the parties.” Alvin Ltd. v. U.S. Postal Serv., 816 F.2d 1562, 1565 (Fed.Cir.1987). Contract interpretation begins with the language of the written agreement, which must be given “[its] ordinary meaning unless the parties mutually intended and agreed to an alternative meaning.” Harris v. Dep’t of Veterans Affairs, 142 F.3d 1463, 1467 (Fed.Cir.1998). We may not resort to extrinsic evidence “to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting.” Metric Constructors, Inc. v. Nat’l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed.Cir.1999); see also Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed.Cir.2004) (en banc).
Under the “Taxes” clause of the avgas contracts, the Government agreed to reimburse the Oil Companies for “any new or additional taxes, fees, or charges” that may be imposed “by reason of’ the production, sale, and delivery of avgas. Shell Oil Company’s contract, dated April 10, 1942, is representative of all the avgas contracts at issue here and provides:
XII. Taxes
a) Buyer shall pay in addition to the prices as established in Sections IV and V hereof, any new or additional taxes, fees, or charges, other than income, excess profits, or corporate franchise taxes, which Seller may be required by any municipal, state, or federal law in the United States or any foreign country to collect or pay by reason of the production, manufacture, sale or delivery of the commodities delivered hereunder. Buyer shall also pay any such taxes on crude petroleum, or the transportation thereof, to the extent such taxes result in increased cost of the commodities delivered hereunder not compensated for by Section V hereof.
J.A. 111-12 (Shell Oil Co. Contract, Apr. 10,1942) (emphasis added).
The majority’s conclusion that CERCLA liability is covered by this clause hinges on an isolated interpretation of the word “charges.” The majority engages in a lengthy discussion of the plain meaning of “charges” and concludes that it is synonymous with “costs.” Maj. Op. at 1291-93. The majority then proceeds to hold that the “Taxes” clause requires the Government to reimburse the Oil Companies for costs of any and all type, regardless of how they were incurred, as long as those costs arise “by reason of’ the production and delivery of avgas.
Such an interpretation ignores the contractual character and import of the “Taxes” clause. When read as a whole, the contract signals that the parties, at the *1305 time they entered into the contract, intended the “Taxes” clause to be read as a price-adjustment mechanism covering unexpected tax-related burdens. First, the clause is titled “Taxes.” Second, the clause uses the term “such taxes” several times to refer back to the broader category of “taxes, fees, or charges.” Third, the specific exclusions from “taxes, fees, or charges” are all income and related taxes, including “income, excess profits, [and] corporate franchise taxes.” Finally, the clause provides that the payment of “new or additional taxes, fees, or charges” will be in addition to the prices established in the “Price and Payment” (Section IV) and “Price Escalation” (V) clauses of the contract. The term “charges” should thus be interpreted consistently and in harmony with the broader operation of the “Taxes” clause as a price-adjustment mechanism.
The majority summarily dismisses these textual signals in favor of an isolated and overly-broad interpretation of the singular term “charges” to conclude that “[t]he plain language of the new or additional charges provision” must encompass CERCLA liability. Maj. Op. at 1293. In doing so, the majority ignores the trial court’s use of the noscitur a sociis canon of interpretation, which “is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: ‘[A] word is known by the company it keeps.’ ” James v. United States, 550 U.S. 192, 222, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007) (Scalia, J., dissenting) (alteration in original) (quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)). Indeed, contract terms must be construed, not in isolation, but as a whole and in a way that gives effect to the surrounding context. NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed.Cir.2004) (noting that a contract must “be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts”); Metric Constructors, 169 F.3d at 752 (“Before arriving at a legal reading of a contract provision, a court must consider the context and intentions of the parties.”). “The context and subject matter of a contract may indicate that an ordinary word or phrase has an unusual meaning in a given sentence.” 11 Richard A. Lord, Williston on Contracts § 32:6 (4th ed. 1999 & Supp.2009). “[I]t is questionable whether a word has a meaning at all when divorced from the circumstances in which it is used.” E. Allen Farnsworth, Contracts 454 (4th ed.2004). Here, the majority’s interpretation ignores the plain meaning of the text, fails to give harmony to the contracts as a whole, and is overall unreasonable.
For example, the majority dismisses, in a footnote, any reliance on the title of the clause (“Taxes”) as evidence of the clause’s fairly narrow tax-related meaning. Maj. Op. at 1293-94 n. 9. The majority notes that the Supreme Court tends to “placet ] less weight on” captions, headings and titles when construing statutory provisions. Id. (quoting Lawson v. FMR LLC, No. 12-3, — U.S.-, 134 S.Ct. 1158, 1169, 188 L.Ed.2d 158 (2014)). This principle, which is often used when “the [statutory] text is complicated and prolific,” nevertheless recognizes that a heading can be a helpful “ ‘short-hand reference to the general subject matter’ of the provision.” Lawson, 134 S.Ct. at 1169 (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947)). Hence, Supreme Court precedent supports a finding that the parties intended for the “general subject matter” of this clause to cover “Taxes” and tax-related items.
The majority rejects the Government’s comparison of the “Taxes” clause to the terms of other contemporaneous contracts as an improper reliance on extrinsic evidence in the absence of an “established *1306 ambiguity.” Maj. Op. at 1295. At the same time, the majority itself informs its broad interpretation of the “Taxes” clause by heavily relying on extrinsic evidence. As the majority notes:
World War II and the stark necessity of increased avgas production are the circumstances surrounding the formation of the avgas contracts. The Government was in a position of near-complete authority over existing refineries, but needed the Oil Companies’ cooperation to construct new production facilities to meet the extraordinary demand for av-gas.
Maj. Op. at 1296 (emphasis original). The majority concludes that “[tjhese circumstances confirm that the new or additional charges provision must be interpreted to require reimbursement for the Oil Companies’ CERCLA costs arising from avgas production.” Id. The majority thus justifies its broad interpretation of the “Taxes” clause not on the language of the clause itself but on a weighing of the equities in light of the wartime circumstances, subject matter not in the record' before us and certainly not reflected by the terms of the contract. I believe that reliance on unsupported historical and social anecdotes should not trump the plain meaning of the contract terms and, in this case, transform a straightforward “Taxes” clause into a catch-all indemnification provision. See, e.g., City of Oxnard v. United States, 851 F.2d 344, 347 (Fed.Cir.1988) (noting that the contract language is the best evidence of the parties’ intent and should take precedence over any “subjective intent of one of the parties, if contrary to the unambiguous and reasonable text of the written contract”).
II.
Even if the “Taxes” clause could be interpreted to encompass certain non-tax-related costs, the majority does not adequately explain why the clause should be extended to indemnify CERCLA liability. As we have previously noted:
In order for a pre-CERCLA indemnification clause to cover CERCLA liability, courts have held that the clause must be either [1] specific enough to include CERCLA liability or [2] general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims.
E.I. Du Pont de Nemours & Co. v. United States, 365 F.3d 1367, 1373 (Fed.Cir.2004) (quoting Elf Atochem N. Am. v. United States, 866 F.Supp. 868, 870 (E.D.Pa.1994)). As we noted in DuPont, “CERCLA evolved from the doctrine of common law nuisance” and is thus similar to tort-based liability claims. DuPont, 365 F.3d at 1373. CERCLA gives the President broad power to direct the Government to clean up a hazardous waste site itself or to command the responsible parties to do so. See Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 160, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004). Responsible parties may thus satisfy their CERCLA liability by means other than cash payments to governmental entities. Had the Oil Companies self-performed the clean-up efforts at the McColl Site, they would have even less of a basis to argue that the clean-up costs are encompassed by the “Taxes” clause because the clause covers only “charges” the contractor was required by a government entity “to collect or pay.”
Here, nothing in the plain language of the avgas contracts indicates that the parties intended for the “Taxes” clause to “allocate [generally] all possible liabilities” among themselves, much less to allocate specifically the risks of environmental liability. Id. The “Taxes” clause is devoid of any language that resembles the broad indemnification provisions considered by our decisions in DuPont and Ford Motor Co. See DuPont, 365 F.3d at 1367; Ford *1307 Motor Co. v. United States, 378 F.3d 1314, 1314 (Fed.Cir.2004). In DuPont, we held that the Government’s agreement “to hold [DuPont] harmless against any loss, expense ... or damage ... of any kind whatsoever ” was sufficient to include CERCLA liability. 365 F.3d at 1372 (emphasis added). In Ford Motor Co., we similarly held that CERCLA liability was covered by a provision requiring reimbursement of all “allowable costs,” including “loss or destruction of or damage to property as may arise out of or in connection with the performance of the work under this contract.” 378 F.3d at 1319 (emphasis added). No such provision exists in this case.
Yet, the majority’s entire analysis rests on the conclusion that a term requiring payment of “charges” or “costs” is sufficient to require broad indemnification. Maj. Op. at 1294. But the “Taxes” clause lacks any reference to concepts indicating that the parties intended to enter into a broad indemnity provision; terms like “loss,” “damage,” “liability,” “destruction,” “indemnify,” “hold harmless,” and “injury” are nowhere to be found. Although I agree with the majority that no “special words” are required to give effect to a promise of indemnification, id., that does not mean that the contract can be devoid of any objective indicia of the parties’ intent to generally allocate liability between them. See, e.g., City of Oxnard, 851 F.2d at 347. In my view, the avgas contracts lack any evidence of such intent.
If history serves a purpose in this case, it is to show that in the 1940s, as today, avgas production results in byproducts, some of which are wastes. Waste created in the production of petrochemicals represents a cost on the producer, in this case the Oil Companies. That the contracts are silent on who bears the cost related to the production and disposal of avgas-related byproducts indicates that the parties intended the cost to be borne by the Oil Companies.
Indeed, the plaintiffs in this case are sophisticated companies that “surely would know how to [negotiate and] draft broad hold harmless indemnification clauses extending in perpetuity if that were their intent,” even during wartime. Shell Remand Decision, 108 Fed.Cl. at 425. Our previous decisions in DuPont and Ford Motor Co. provide evidence of this very fact. The Oil Companies’ best opportunity to recover their clean-up costs from the Government was through the CERCLA litigation in California, and they should not now be allowed to recover by fitting a square peg into a round hole. The majority errs by interpreting a straightforward “Taxes” clause as a catch-all indemnification provision. Therefore, I must dissent.

. I do not interpret the "Taxes” clause as allowing the Oil Companies to recover their CERCLA costs, I do not address the Court of Federal Claims’s conclusion that recovery is also precluded by general release and the Anti-Deficiency Act.